IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

AMERICAN NATIONAL PROPERTY AND
CASUALTY COMPANY,

      Plaintiff,

v.                          Civil Action No. 5:14CV58
                                       (STAMP)

JEANETTE L. SHIELDS, individually
and as Administratrix of the
ESTATE OF LUKE B. SHIELDS and
RICHARD J. PIZZOFERRATO, individually
and as Administrator of the
ESTATE OF TONI MARIE SHIELDS,

      Defendants.


**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT SHIELDS' MOTION FOR JOINDER,**
**DENYING MOTION TO DISMISS FOR LACK OF JURISDICTION**
**AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.  Procedural History

This declaratory judgment action was brought by the American National Property and Casualty Company ("ANPAC"). ANPAC is seeking a declaration by this Court that based on the language of the underlying homeowner's and renter's policies, there is no or limited coverage for the claims that have been brought in an underlying state action for the Estate of Luke B. Shields ("Luke Shields Estate") or Jeanette L. Shields ("Jeanette"), who is a defendant in this action individually and as a representative of the Luke Shields Estate. The state action in this case was brought by defendant Richard J. Pizzoferrato ("Pizzoferrato"), individually and as the Administrator of the Estate of Toni Marie Shields ("Toni

Shields Estate"), against Jeanette, individually, and in her capacity as Administratrix of the Luke Shields Estate. Prior to the state action being filed, Luke Shields ("Luke") allegedly shot and killed Toni Shields ("Toni") and then killed himself. The state action complaint alleges that Luke intentionally shot and killed Toni and that Jeanette negligently permitted Luke to have access to the gun that was used in the fatal shooting. Toni and Luke were married and resided together at a residence that was co-owned by Jeanette, Luke's mother, and Luke. Jeanette had both a homeowner's policy, which lists 271 Seneca Street, Weirton, West Virginia ("271 Seneca") and a renter's policy, which lists the residence wherein Toni and Luke resided, 260 Seneca Street, West Virginia ("260 Seneca"). ANPAC has now filed a motion for summary judgment. That motion is fully briefed.

Further, after a pre-trial conference was held in this action, defendant Pizzoferrato filed a motion to dismiss for lack of jurisdiction. This was after this Court orally announced at that conference that any reference to jurisdictional issues in Pizzoferrato's answer to the complaint did not constitute a formal motion pursuant to this Court's local rules and any such request of review was denied without prejudice. The motion to dismiss for lack of jurisdiction is now fully briefed and must be considered before this Court may proceed with consideration of the motion for summary judgment.

A.  Motion to Dismiss for Lack of Jurisdiction

Pizzoferrato argues that ANPAC has failed to meet its burden of establishing that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Pizzoferrato asserts in his motion that the state court plaintiff demanded judgment in an amount in excess of the minimum jurisdictional limits of the Circuit Court of Hancock County, West Virginia which are less than $75,000.00, exclusive of interest and costs, federal threshold. Thus, Pizzoferrato contends that ANPAC has failed to meet its burden to prove that the damages sought in the state court action will exceed $75,000.00, exclusive of interest and costs. Pizzoferrato argues that (1) ANPAC has not made a settlement offer in excess of $75,000.00, exclusive of interest and costs, but has only made an offer of $7,500.00 and (2) ANPAC has otherwise relied upon speculative evidence based on the state court complaint which contains unliquidated damages which can only be determined by a jury.  Shields filed a motion for joinder to Pizzoferrato's motion and incorporated the previous arguments by reference.

In response, ANPAC asserts that the motion to dismiss is without merit because it is untimely under the scheduling order. Further, ANPAC argues that it does not bear the burden of proving the amount in controversy by a preponderance of the evidence.  On the other hand, ANPAC contends that because this case originated in

federal court the legal certainty standard applies. Under this test, ANPAC asserts that it pleaded, in good faith, that the amount in controversy was in excess of $75,000.00, exclusive of interest and costs. ANPAC cites the fact that the claims for wrongful death have a potential recovery, and thus potential coverage from ANPAC, of $600,000.00 under the two policies at issue as each has a policy limit of $300,000.00.

Based on the above, ANPAC argues that the burden has been shifted to the defendants to show, to a legal certainty, that the amount in controversy is insufficient. ANPAC argues that the defendants have not done so by simply citing ANPAC's current settlement offer of $7,500.00. ANPAC asserts that although the settlement offer may be considered, it is not conclusive. Further, ANPAC contends that the offer is not reflective of the amount in controversy but rather a reflection of ANPAC's position that the defendants are not entitled to coverage as stated in its declaratory judgment petition. Finally, ANPAC asserts that this Court should consider Pizzoferrato's initial demand of $500,000.00 and his July 6, 2015 demand, after the pre-trial conference, of $250,000.00.

In reply, the defendants argue that the motion to dismiss is not untimely as the lack of subject matter jurisdiction may be raised at any time while a case is pending. Further, the defendants assert that despite any action on behalf of the parties,

this Court must order remand if it finds that jurisdiction is lacking. As to the amount in controversy, the defendants contend that the face amount of an insurance policy at issue is irrelevant, rather, this Court must look to the claim which is the object of the litigation. The defendants reiterate that because ANPAC has only offered $7,500.00 in settlement, ANPAC believes the claim is valued at less than $75,000.00, exclusive of interest and costs.

B. <u>Motion for Summary Judgment</u>

ANPAC first notes that it is not seeking a declaratory judgment as to the access to the rifle claim against Jeanette, individually. ANPAC states that these negligence claims are covered under the homeowner's policy. ANPAC states that it is seeking a declaration that there is no coverage for the actions of Luke under either of the policies issued to Jeanette, no medical coverage for Toni's death, and no coverage for Jeanette, individually, under the renter's policy.

1. <u>Homeowner's Policy</u>

ANPAC argues that Luke is not covered under this policy because he is not an insured as he is not the named insured or a resident of 271 Seneca. Under West Virginia law, ANPAC contends that Luke does not qualify as a "resident" of 271 Seneca because: (1) he had reached an age where he was self-sufficient, (2) he was a joint owner of 260 Seneca and Jeanette refers to that as Luke's

home, and (3) he maintained his own separate residence from Jeanette.

Additionally, ANPAC argues that Toni's Estate is not entitled to medical coverage under this policy because the injuries did not occur at the insured location, and thus she must qualify under four of the conditions in the policy for non-insured location injuries. ANPAC asserts she does not qualify because (1) the injuries did not arise out of a condition at 271 Seneca, (2) the death of Toni was not caused by the activities of any insured because Luke is not an insured under the policy, (3) the injuries were not caused by a resident employee, and (4) injuries were not caused by an animal owned or in the care of Jeanette.

In response, Pizzoferrato asserts that Luke was a resident of 271 Seneca because Jeanette testified that she was injured in June 2012 and that Luke had been spending the night with her and lived with her thereafter until his death. Thus, Pizzoferrato argues that Luke was living at 271 Seneca and Toni was residing at 260 Seneca. Further, Pizzoferrato notes that the policy lists residents as "your relatives" and Luke was Jeanette's relative. Finally, Pizzoferrato contends that Luke was a resident of 271 Seneca under West Virginia precedent because a person may have more than one residence. Pizzoferrato also argues that Toni is entitled to medical coverage because although Toni's death occurred off the

insured location, the activities that caused her death were caused by an insured, Luke.

Jeanette argues that there is a genuine issue of material fact as to whether Luke intentionally shot Toni or if he was so impaired that he accidentally shot her. Further, Jeanette asserts that Luke was a resident of 271 Seneca because he had moved in with Jeanette to be her caretaker and was escaping the turbulent relationship with Toni. Jeanette contends that Luke had no intent to reside at 260 Seneca at the time of the incident.

ANPAC replies that Luke's stay at 271 Seneca was transient and impermanent as he had only stayed at the residence for 13 days and did not intend to stay there. ANPAC reviews the five Tucker[1] factors and reasserts that none of them are met in this action and the defendants have not provided any evidence to support a finding that those factors are met. ANPAC cites the following: (1) Luke did not intend to stay at 271 Seneca permanently and there is no evidence that he did not intend to return to 260 Seneca once Jeanette recovered, (2) Luke had not removed any items from 260 Seneca or made plans to move from 260 Seneca, (3) Luke continued to have lodging at 260 Seneca, and (4) Luke was an adult and was self-sufficient.

2. Renter's Policy

---

[1]Farmers Mut. Ins. Co. v. Tucker, 576 S.E.2d 261, 270 (W. Va. 2002).

The renter's policy covers 260 Seneca, where Luke and Toni resided. The named insured on the policy is Jeanette. ANPAC argues that Luke is not an "insured" under the policy because "insured" is defined as the named insured and spouse. ANPAC asserts that Luke is not a named insured nor a spouse of Jeanette and thus the Shields Estate does not qualify for coverage under the policy. Further, ANPAC asserts that Toni's death was not caused by an "occurrence," as defined under the policy, because Toni's death was caused by the intentional acts of Luke. Moreover, ANPAC contends that Toni's death did not arise out of the ownership, maintenance, or use of the insured premises because the home in which the incident occurred was merely the situs of the events and did not cause the injury. Finally, ANPAC argues that the medical payments coverage provision does not apply because the injury in this case did not "arise from a condition" on the insured premises, but rather occurred because of the intentional acts of Luke.

In response, Pizzoferrato argues that Toni's death was caused by an occurrence under this policy. Pizzoferrato cites Pennsylvania law in support of this contention. Further, the defendants assert that an "occurrence" may include an alleged intentional act as long as negligence is alleged as the reason for those acts. Pizzoferrato asserts that in this case the state court complaint alleges that Jeanette was negligent in providing Luke access to a gun and thus this qualifies under the policy.

Pizzoferrato also argues that ANPAC has provided no evidence that Luke intended to kill Toni and that Luke's level of intoxication prevents the incident from being construed as intentional.

Moreover, Pizzoferrato contends that Toni's death occurred as a result of the use of the insured property as she was shot at 260 Seneca. Pizzoferrato asserts that because Jeanette was half owner of 260 Seneca, Luke was residing with her at the time of the incident, and Jeanette had knowledge of the violent relationship between Toni and Luke, Jeanette should have taken reasonable steps to prevent Luke from using or entering 260 Seneca.

In reply, ANPAC argues that Luke's intoxication the night of July 8, 2012 into the morning of July 9, 2012 does not negate the intentional acts exclusion. First, ANPAC reasserts that Luke was not an insured and that the defendants' argument must rely on Luke being found to be an insured. ANPAC next asserts that a diminished capacity defense does not negate an intentional act exclusion under West Virginia law so long as the insured had a "minimal awareness of the nature of his act." ANPAC contends that there is no evidence to support a finding that Luke did not have a "minimal awareness of the nature of his act" given the record in this case.

ANPAC further argues that Toni's death was not the result of the use of the insured property because in this case there was no heightened duty of care as the property was not open to the public. Additionally, ANPAC asserts that Toni's death does not qualify as

an "occurrence" under West Virginia law because it was intentional and the defendants have incorrectly cited Pennsylvania law.

Based on the findings below, this Court finds that ANPAC's motion for summary judgment is granted.

### III. Applicable Law

**A. Motion to Dismiss for Lack of Jurisdiction**

Federal courts have original jurisdiction over primarily two types of cases: (1) those involving federal questions under 28 U.S.C. § 1331, and (2) those involving citizens of different states where the amount in controversy exceeds $75,000.00, exclusive of interests and costs, pursuant to 28 U.S.C. § 1332(a).

Generally, courts apply the "legal certainty" test in determining whether the amount in controversy requirement is met where a case originates in federal court and diversity jurisdiction is challenged. St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938); Shanaghan v. Cahill, 58 F.3d 106, 112 (4th Cir.1995). Under this test, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indemnity Co., 303 U.S. at 288-89; see also Erie Insurance Property & Casualty Company v. Stricklin, No. 5:13cv30, 2013 WL 6265843 (N.D.W. Va. Dec. 4, 2013). Thus, the burden is initially on the plaintiff to allege, in good faith, an amount in controversy

exceeding $75,000.00, exclusive of interest and costs, and if that is done, then the burden shifts to the defendant to prove, to the level of a legal certainty, that the amount in controversy is not sufficient.  Id.

B.    Motion for Summary Judgment

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact."  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Id. at 256.

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (Summary

judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing <u>Stevens v. Howard D. Johnson Co.</u>, 181 F.2d 390, 394 (4th Cir. 1950))). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

IV. <u>Discussion</u>

A. <u>Motion to Dismiss for Lack of Jurisdiction</u>

Initially, this Court finds that Jeanette's motion for joinder is granted. Further, this Court finds that the motion to dismiss for lack of jurisdiction is not untimely as a challenge to subject matter jurisdiction may be raised at any time while an action is pending. <u>Grupo Dataflux v. Atlas Global Grp., L.P.</u>, 541 U.S. 567, 571 (2004) ("Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment."). Additionally, the parties' own actions cannot affect the requirement that this Court have jurisdiction over an action. <u>Brickwood Contractors, Inc. v. Datanet Eng'q, Inc.</u>, 369 F.3d 385, 390 (4th Cir. 2004) (en banc) (citing <u>United States v. Cotton</u>, 535 U.S. 625, 630 (2002)). Thus, a party cannot waive subject matter jurisdiction. <u>Id.</u> As such, this Court finds that the defendants' actions did not foreclose their ability to raise a challenge to

subject matter jurisdiction. However, this Court finds that exercising jurisdiction in this case is proper.

The amount in controversy for purposes of a declaratory judgment action is measured by the "value of the object of the litigation." <u>Toler v. State Farm Mut. Auto. Ins. Co.</u>, 25 F. App'x 141, 143 (4th Cir. 2001) (quoting <u>Hunt v. Washington State Apple Advertising Commission</u>, 432 U.S. 333, 347 (1977)). When the question in a declaratory judgment action is the applicability of a particular insurance policy to an underlying claim, rather than the validity of the policy, the amount in controversy is determined by the value of the underlying claim, not the face value of the policy. <u>Darbert, Inc. v. Bituminous Cas. Corp.</u>, 792 F. Supp. 487, 489 (S.D.W. Va.1992). Thus, the object of the litigation is the claim, not the policy itself. <u>Stricklin</u>, No. 5:13CV30, 2013 WL 6265843, at *2.

ANPAC has made an allegation in good faith that the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The underlying state claims against Luke and Jeanette include claims for wrongful death and seek coverage of funeral and burial expenses. The potential coverage at issue totals $600,000.00 in this case. The homeowner's policy and renter's policy cover liability and medical payments coverage. Thus, although the face value of the policies themselves are not necessarily indicative of the amount in controversy, ANPAC likely in good faith considered

13

the possible outcome if its petition was denied and full coverage was recovered by Pizzoferrato in the state court case. Additionally, ANPAC has asserted that Pizzoferrato made an initial demand in this case of $500,000.00, which was later reduced to $250,000.00 after this Court held its pre-trial conference. Although settlement offers are not conclusive, they may be used as a factor in determining whether or not the amount in controversy is met. Mullins v. Harry's Mobile Homes, Inc., 861 F. Supp. 22, 24 (S.D.W. Va. 1994) (noting that "settlement offers routinely represent a discount from the damages plaintiffs will attempt to prove at trial"). Thus, this Court finds that ANPAC's allegation of the amount in controversy was made in good faith.

The defendants have not met their burden of proving to a legal certainty that the amount in controversy has not been met. To meet such a burden, "[t]he legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim." Wiggins v. North American Equitable Life Assurance Co., 644 F.2d 1014, 1017 (4th Cir. 1981) (quoting McDonald v. Patton, 240 F.2d 424, 426 (4th Cir. 1957)).

Again, although settlement offers are not determinative of the amount in controversy, they do count for something. See Burns v. Windsor Ins. Co., 31 F.3d 1092, 1097 (11th Cir. 1994); Contraquerro v. Hall, No. CIV.A. 5:06CV150, 2007 WL 1381394, at *2 (N.D.W. Va. May 8, 2007). Both settlement offers by Pizzoferrato have far

14

exceeded the $75,000.00 threshold, exclusive of interest and costs, and ANPAC's offer of $7,500.00 exceeded its stance that the defendants are not entitled to coverage at all. As noted above, this is taken in conjunction with the notion that "settlement offers routinely represent a discount from the damages plaintiffs will attempt to prove at trial." <u>Mullins v. Harry's Mobile Homes, Inc.</u>, 861 F. Supp. 22, 24 (S.D.W. Va. 1994). Thus, the defendants have failed to meet the steep burden that is required by the legal certainty test and the motion to dismiss for lack of subject matter jurisdiction is denied.[2]

B.    <u>Motion for Summary Judgment</u>

As the insurance policies at issue were entered into in West Virginia, West Virginia law would govern interpretation of the insurance policy at issue in this declaratory judgment action, where jurisdiction is based on diversity of citizenship. <u>See</u> <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 58 (1938); <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941) (holding that <u>Erie</u> prohibition "against such independent determinations by the federal courts extends to the field of conflict of laws" and that "conflict

---

[2]This Court notes that what this Court considered the initial motion to dismiss by the defendants, as discussed during the pre-trial conference, was raised in the answer as an affirmative state's interest defense pursuant to <u>Mitcheson v. Harris</u>, 955 F.2d 235, 237-40 (4th Cir. 1992). However, an argument pursuant to <u>Mitcheson</u> was not made in the motion to dismiss that was filed pursuant to this Court's local rules. Therefore, any <u>Mitcheson</u> argument was not considered by this Court as it was not raised in the filed motion to dismiss.

of laws rules to be applied by the federal court in [a state] must conform to those prevailing in [that] state['s] courts"); Johnson v. Neal, 187 W. Va. 239, 418 S.E.2d 349 (1992) (in a contract case, lex loci contractus applies absent a "compelling reason" to deviate from it).

The West Virginia Supreme Court has found that an insurance company may decide "whether it must provide liability coverage and/or a defense to the insured based upon two documents: the complaint, and the insurance policy." West Virginia Fire & Cas. Co. v. Stanley, 602 S.E.2d 483, 498-99 (W. Va. 2004). Thus, resolution of the duty-to-defend or provide coverage question "requires examination of (1) the policy language to ascertain the terms of the coverage and (2) the underlying complaint to determine whether any claims alleged therein are covered by the policy." Fuisz v. Selective Ins. Co. of Am., 61 F.3d 238, 242 (4th Cir. 1995). "This principle is [sometimes] known as the 'eight corners rule' because the determination is made by comparing the 'four corners' of the underlying complaint with the 'four corners' of the policy." First Tenn. Bank Nat'l Ass'n v. St. Paul Fire & Marine Ins. Co., 501 F. App'x 255 (4th Cir. 2012).

In applying the eight corners rule, a court must look to the language of the insurance policy which "should be given its plain, ordinary meaning." Syllabus Point 1, Mylan Labs Inc. v. Amer. Motorists Ins. Co., 700 S.E.2d 518 (W. Va. 2010). "'Where the

16

provisions of an insurance policy contract are clear and
unambiguous they are not subject to judicial construction or
interpretation, but full effect will be given to the plain meaning
intended.'" Syllabus Point 2, id. (citation omitted). However, if
the language of an insurance policy provision is "reasonably
susceptible of two different meanings or is of such doubtful
meaning that reasonable minds might be uncertain or disagree as to
its meaning, it is ambiguous." Syllabus Point 3, id.

1. Consideration of the Record

In the parties' joint pre-trial order, the parties stated:
"the parties stipulate the authenticity and admissibility of the
exhibits attached to ANPAC's Motion for Summary Judgment and
Memorandum in Support, and the exhibits attached to the Response of
Ms. Shields, which make up the factual record in this case." ECF
No. 26 at 8. ANPAC confirmed that it still held such a position at
the pre-trial conference. However, the defendants appeared to
raise issues as to Luke's intent regarding residency and his intent
regarding the discharge of the firearm that subsequently led to
Toni's death.

In Tucker, the West Virginia Supreme Court stated that
"because a determination of residency depends on the intent of the
parties, it is typically a question of fact that cannot be
determined through a motion for summary judgment." 576 S.E.2d at
270 (citation omitted). However, where a court makes "solely legal

17

determinations based on stipulated facts," for the purposes of review in a declaratory judgment action where the parties agree to a bench trial, it makes little difference if the court does so pursuant to summary judgment or following trial. FDIC v. Kan. Bankers Sur. Co., 963 F.2d 289, 292 (10th Cir. 1992). To reiterate, the parties have stipulated that the record provided in the briefs regarding the motion for summary judgment "make up the record in this case." ECF No. 26 at 8. Further, this Court did a thorough examination of the exhibits and witnesses the defendants were planning to provide at the bench trial and finds that, as this Court will be the trier of fact at any trial in this case, such witnesses and exhibits would not add to the record that has already been stipulated to by the parties in the pre-trial order. Accordingly, this Court finds that it may, at this time, consider all issues raised by the parties in the motion for summary judgment dispositively.

     2.   Homeowner's Policy

        a.   Luke Shields

The defendants contend that Luke was an "insured" under the homeowner's policy because he resided at 271 Seneca a short time before and leading up to July 9, 2012. ANPAC argues that Luke was not an "insured" because he resided at 260 Seneca and his presence at 271 Seneca for a short time before and leading up to July 9, 2012 did not make him a resident under West Virginia law.

In reference to who is an insured under its liability coverage, the homeowner's policy at issue states:

> "If a claim is made or suit is brought against any insured for damages because of bodily injury or property damage to which this coverage applies, we will; . . . Pay up to our limited liability for the damages for which th insured is legally liable; and . . . Provide a defense at our expense by counsel of our choice . . . [which] ends when the amount we pay for damages resulting from the occurrence equals our limit of liability."

ECF No. 15-2. The policy defines an "insured," as applicable in this case, as: "you and the following residents of your household: . . . your relatives; . . . any other person under the age of 21 who is in the care of any person named above." Id.

In Tucker, the West Virginia Supreme Court stated as follows:

> [I]n a homeowners' insurance policy that does not otherwise define the phrase "resident of your household," the phrase means a person who dwells-though not necessarily under a common roof-with other individuals who are named insureds in a manner and for a sufficient length of time so that they could be considered to be a family living together. The factors to be considered in determining whether that standard has been met include, but are not limited to, the intent of the parties, the formality of the relationship between the person in question and the other members of the named insureds' household, the permanence or transient nature of that person's residence therein, the absence or existence of another place of lodging for that person, and the age and self-sufficiency of that person.

Tucker, 576 S.E.2d 261 at 270. That court further held that a person may have more than one "residence." Id. at 266. Thus, this Court must determine whether Luke qualified as a resident of 271 Seneca.

Jeanette is listed as the named insured on the homeowner's policy for the residence at 271 Seneca. Jeanette referred numerous times throughout her deposition to 260 Seneca as Luke's house and 271 Seneca as Jeanette's house. ECF No. 15-4 at 11-13, 15, 18, 22, 24-26, 36, 43, 46, 61-63 (this Court counted at least seventeen times where Jeanette referred to the two locations in this way). Further, Jeanette indicated that Luke resided with her from November 2011 to April 2012, and Toni resided with her from December 2011 to April 2012 (after Toni and Luke were married in February 2012), at which time Luke and Toni moved into 260 Seneca. The residence at 260 Seneca was owned jointly by Jeanette and Luke with a "right of survivorship." Jeanette stated that the deed was set up in this way so that when she died, Luke would have full ownership of the property. Jeanette testified that until June 2012, Luke had been doing some welding, and otherwise delivered papers for local businesses.

Jeanette stated that Luke began staying the night and taking care of her at 271 Seneca after Jeanette fell and broke her hip on June 23, 2012 and spent three subsequent days in the hospital. Luke took care of his mother in this way until the incident on July 9, 2012. However, Jeanette also testified that during this time period her daughter, a physical therapist, and a nurse would also come and take care of her at 271 Seneca. Further, Toni and Luke were involved in a domestic dispute at 271 Seneca on July 6th or

7th, 2012. Additionally, the morning of July 9, 2012, Luke came back to 271 Seneca to check on his mother before walking over to 260 Seneca, even though Jeanette thought he had stayed the night at 271 Seneca.

The facts in this case lead to a conclusion that Luke was not an insured under the homeowner's policy as he was not a resident of 271 Seneca. Here, given Jeanette's testimony, the intent of the parties was for Luke to have "his house" and Jeanette to have her house (she referred to it as "my house"). Given Jeanette's testimony, the pattern that was formed was that Luke only stayed with Jeanette, when necessary, for short periods of time: when there was a house fire at 260 Seneca and when Jeanette was unable to take care of herself because of a broken hip. Further, Luke's presence at 271 Seneca was not permanent in nature but was more akin to the other caretakers, such as his sister, nurse, and physical therapist. By July 9, 2012, Luke had only been staying at 271 Seneca for thirteen days, at most, and had began reconciling with Toni after the July 6th or 7th domestic incident. Moreover, the only evidence provided that Luke had moved anything back into Jeanette's home was that he had moved his guns into the 271 Seneca residence after the July 6th or 7th domestic incident wherein Toni threatened him with a gun. Thus, the facts show that Luke only resided at 271 Seneca in a transient nature, when necessary and only for short time periods.

As to the absence or existence of another place of lodging for that person, it is clear in this case that Luke had the residence at 260 Seneca as an alternative place of lodging from 271 Seneca and in fact this was his actual residence. This is further solidified by Jeanette's testimony that their joint ownership was meant to ultimately lead to Luke having full ownership of 260 Seneca. The evidence does not provide that any such arrangement existed for 271 Seneca. Finally, the evidence provides that Luke was a thirty-five year old adult and had been employed either as a welder or paper deliverer at the time in question. As such, he was of an age and had the means to be self-sufficient and to reside on his own at 260 Seneca if (1) there had not been a house fire at that residence, and (2) his mother did not require his care. Accordingly, based on the facts in this case provided through the stipulated record, as applied to the Tucker factors, this Court finds that a reasonable jury could not find that Luke was a resident at 271 Seneca and thus would qualify as an "insured" under the homeowner's policy.

b. Toni Shields: Medical Coverage

ANPAC has conceded that the homeowner's policy also provides medical payments coverage, including funeral expenses, subject to certain exceptions. However, ANPAC argues that because the injury occurred off of the insured location, and none of the exceptions for when bodily injury occurs off of the insured location under the

policy apply, there is not coverage. The defendants contend that the bodily injury that occurred at 260 Seneca was caused by the activities of an "insured," Luke.

Under the medical coverage section at issue, the homeowner's policy states that ANPAC will pay medical expenses, including funeral expenses when bodily injury occurs to persons off the insured location, if the bodily injury:

(1)  Arises out of condition in the insured location or the ways immediately adjoining.
(2)  Is caused by the activities of any insured;
(3)  Is caused by a resident's employee in the court of the resident's employee's employment by an insured; or
(4)  Is caused by an animal owned by or in the care of any insured.

ECF No. 15-2. The parties agree, in this action, that Toni's injuries were caused by Luke. However, based on this Court's finding above that Luke was not an "insured" under the homeowner's policy, the second exception above does not apply. Further, the defendants have not put forward any argument as to why the other three exceptions under this section of the homeowner's policy would apply. Accordingly, this Court finds that no reasonable jury could find that the medical coverage section applies.

3.  <u>Renter's Policy</u>

a.  <u>Luke Shields</u>

The parties agree that Jeanette is a named insured under the renter's policy. Neither of the defendants have argued otherwise or argued that Luke is a named insured or a spouse of a named

23

insured under the renter's policy.  Thus, it is accepted by this Court that Luke is not an "insured" under the renter's policy.

b.  <u>"Occurrence"</u>

The defendants argue that the death of Toni constituted an "occurrence" under the renter's policy liability coverage section because Luke's intoxication negated any intent he may have had to kill Toni.  ANPAC makes an inapposite argument and asserts that Luke's act of killing Toni was intentional and therefore does not constitute an accident or "occurrence."

The renter's policy defines an "occurrence" as:

an accident, including exposure to conditions, which results in:
    a. bodily injury;
    b. property damage; or
    c. personal injury;
during the policy period.  Repeated or continuous exposure to the same general conditions is considered to be one occurrence.

ECF No. 15-3.  In his response brief, Pizzoferrato relies on Pennsylvania precedent and case law, along with citing West Virginia law.  However, as stated previously, this Court must apply West Virginia law in order to determine the application of the insurance policies at issue.  As such, because there is controlling West Virginia precedent, this Court will apply such law.

The West Virginia Supreme Court has adopted the following definition for "accident" under an exclusionary "occurrence" provision in an insurance policy:

> [a]n "accident" generally means an unusual, unexpected
> and unforeseen event . . . . An accident is never
> present when a deliberate act is performed unless some
> additional unexpected, independent and unforeseen
> happening occurs which produces the damage . . . . To be
> an accident, both the means and the result must be
> unforeseen, involuntary, unexpected, and unusual.

State Bancorp, Inc. v. U.S. Fid. & Guar. Ins. Co., 483 S.E.2d 228,

234 (W. Va. 1997) (citing Harrison Plumbing & Heating, Inc. v. New

Hampshire Insurance Group, 681 P.2d 875, 878 (Wash. App. 1984)

(citations omitted). Further, under West Virginia precedent,

"primary consideration, relevance, and weight should ordinarily be

given to the perspective or standpoint of the insured whose

coverage under the policy is at issue." Columbia Cas. Co. v.

Westfield Ins. Co., 617 S.E.2d 797, 801 (2005) (finding that

suicides of inmates in a county jail were "occurences" under

liability insurance policy).

Here, the first issue that must be addressed is the fact that

Jeanette, rather than Luke, is the insured under the renter's

policy. Thus, there is a question as to whether the "occurrence"

should be considered as intended by Jeanette or Luke. This Court

notes that under Westfield Ins. Co., cited above, this Court should

address this argument from the view of Jeanette. The court in

Westfield Ins. Co. specifically stated in a footnote that adopting

an approach as that asserted by ANPAC-viewing the intent from

Luke's point of view:

> might preclude liability insurance coverage for insureds
> in many cases involving allegedly intentional or non-

25

> accidental conduct by actors who had a substantial and
> material role in causing an injury, but where the insured
> seeking coverage cannot be fairly "tarred with the same
> brush" of that actor's coverage-defeating conduct . . . .
> [N]egligent entrustment cases come to mind . . . where an
> insured was allegedly negligent but did not (actually or
> constructively) intend to cause a specific injury.

Id. at 801, n.5.  Thus, it appears that this is such a case wherein

this Court must find that the July 9, 2012 incident was in fact an

"occurrence" based on the view point of Jeanette.  Even if Jeanette

was negligent in allowing Luke access to firearms, that is not

enough under West Virginia precedent to make her actions

intentional under this insurance provision.  However, the

"occurrence," under the renter's policy must also have arisen out

of the ownership, maintenance, or use of the insured premises.

> c.  <u>"Arise out of the ownership, maintenance or use of
> the insured premises"</u>

The defendants argue that the July 9, 2012 incident arose out

of the ownership, maintenance, or use of the insured premises

because Jeanette knew of the domestic turbulence between Luke and

Toni and should have taken reasonable steps to prevent Luke from

using or entering 260 Seneca.  On the other hand, ANPAC asserts

that 260 Seneca was merely the situs of the July 9, 2012 incident

rather than an occurrence caused by a condition of the property.

This Court finds that the "occurrence" did not arise out of

the ownership, maintenance, or use of the insured premises.  The

renter's policy, in pertinent part, states:

> If a claim is made or a suit is brought against any
> insured for damages because of bodily injury . . . caused
> by an occurrence which arises from the ownership,
> maintenance or use of the insured premises, [the insurer]
> will:
>
> 1.   Pay up to our limit of liability for the damages for
> which the insured is legally liable.
>
> 2.   Provide a defense . . . .

ECF No. 15-3.  The West Virginia Supreme Court, while not finding

this type of provision ambiguous, has still given such provision a

broad interpretation.  <u>Baber v. Fortner by Poe</u>, 412 S.E.2d 814, 817

(W. Va. 1991).   The court reasoned that under this broad

interpretation, accidental discharge of a firearm while removing it

from a vehicle or while transporting it are included in the "use"

of an automobile because an automobile is customarily loaded and

unloaded.  <u>Id.</u>  However, the court then noted that "a line must be

drawn at some point [and] courts have generally refused to

interpret the phrase so as to provide liability insurance coverage

for acts which involve intentional shootings."   <u>Id.</u> (citing

<u>Nationwide Mut. Ins. Co. v. Brown</u>, 779 F.2d 984, 988 (4th Cir.

1985)).

Further, the defendants cite two cases which this Court finds

distinguishable.  In <u>Hutzler</u>, the West Virginia Supreme Court found

that owners and lessors of premises used for the serving and

consumption of alcohol may still be covered under a policy, such as

the one above, when an underage person was served alcohol and

subsequently killed while attempting to cross a road on foot.

<u>Farmer & Mechanics Mutual Fire Ins. Co. of West Virginia v.</u>
<u>Hutzler</u>, 447 S.E.2d 22, 23 (W. Va. 1994).  However, the court
reasoned that the owners/lessors of the premises were not liable
because the insurer had assumed that West Virginia legislation
covered the owners rather than only the sellers of alcohol when it
denied coverage.  <u>Id.</u> at 24.  In this case, there is precedent
specifically noting that intentional shootings do not fall within
such policy exclusions and occur from an intentional act rather
than from the intended use of the insured premises or vehicle.
<u>Baber</u>, 412 S.E.2d at 817.

        The other case cited by the defendants, <u>Dotts v. Taressa</u>
<u>J.A.</u>, 390 S.E.2d 568, 569 (W. Va. 1994), is clearly
distinguishable.  In that case, a sexual assault by an employee of
the transit authority occurred on a school bus.  <u>Id.</u> at 569, 575
n.1-2.  However, the West Virginia Supreme Court held that the
assault arose out of the use or operation of the vehicle.  <u>Id.</u> at
569.  The Court made this finding because of the elevated duty of
care owed to passengers by common carriers, especially when the
conduct involves an employee. <u>Id.</u> at 575.  In this case, Jeanette
did not owe such an elevated duty of care to Toni as she was not
subject to an elevated duty of care.

    However, <u>Baber</u>, provides a similar scenario to this case.  In
<u>Baber</u>, the insured went to his estranged wife's home, was involved
in an altercation with his wife's boyfriend, and then shot from his

28

vehicle the boyfriend who was standing in his wife's driveway. The court reasoned that when the insured intentionally shot the boyfriend while in his vehicle, "[t]he shooting did not occur because [the person] drove the truck to visit his wife. The vehicle functioned merely as the situs of a shooting which could easily have occurred elsewhere, given the circumstances." Baber, 412 S.E.2d at 819. Thus, the court found that an intentional shooting that occurred in an insured vehicle was not associated within the "normal use" of the vehicle. Id.

In this case, the July 9, 2012 incident could have occurred elsewhere given the stormy relationship that was documented between Luke and Toni. The shooting did not occur because of any failure by Jeanette to maintain the property, by Jeanette's co-ownership of the property, or from the normal use of the property. The property, similar to the vehicle in Baber, was merely the situs of the incident. Thus, a reasonable jury could not find that the provisions of the renter's policy are triggered. This Court therefore finds that coverage is unavailable.

### d. Medical Payments Coverage

The medical payments coverage provision under the renter's policy also requires that the bodily injury arise from a condition on the insured premises. ECF No. 15-3. As this Court has just found, the July 9, 2012 incident did not arise out of a condition on the insured premises, rather the insured premises were merely a

situs for the incident.  As such, a reasonable jury could not find that the medical payments coverage provision would apply.  Thus, coverage is unavailable under this provision as well.

## V. <u>Conclusion</u>

Based on the analysis above, this Court finds that the defendant Jeanette L. Shields' motion for joinder (ECF No. 30) is GRANTED.  The defendants' motion to dismiss for lack of jurisdiction (ECF No. 27) is DENIED.  The plaintiff's motion for summary judgment (ECF No. 14) is GRANTED.  It is ORDERED that this case be DISMISSED WITH PREJUDICE and STRICKEN from the active docket of this Court.

In accordance with this decision, and the relief requested by the plaintiff in its complaint, this Court finds that:

1.    Based on the language of the ANPAC Homeowner's Policy, there is no liability coverage for the claims in the underlying state action for the Estate of Luke B. Shields;

2.    Based on the language of the ANPAC Homeowner's Policy, there is no medical payments coverage for the claims in the underlying state action;

3.    Based on the language of the ANPAC Renter's Policy, there is no liability coverage for Jeanette L. Shields or the Estate of Luke B. Shields for the claims in the underlying state action; and

4.   Based on the language of the ANPAC Renter's Policy, there is no medical payments coverage for the claims in the underlying state action.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:   July 24, 2015


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE